# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 7, 2014

## STATE OF TENNESSEE v. DONNELL TUNSTALL

**Appeal from the Criminal Court for Shelby County**
**No. 11-01466    Chris Craft, Judge**

---

**No. W2014-00257-CCA-R3-CD  - Filed March 10, 2015**

---

Defendant, Donnell Tunstall, was convicted of attempted second degree murder, employing a firearm during the commission of a dangerous felony, and aggravated assault. He received an effective sentence of thirty-two years for these crimes. Defendant now appeals his convictions, claiming insufficient evidence and improper admission of unfairly prejudicial evidence regarding his previous arrest for the murder of the victim's brother. After careful review, we conclude that the evidence was sufficient to support all of the convictions but that the admission of specific pieces evidence was improper and not harmless. Accordingly, the convictions are reversed and remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Stephen Bush, Shelby County Public Defender; Phyllis Aluko, Assistant Public Defender (on appeal); and William Yonkowski, Assistant Public Defender (at trial), for the appellant, Donnell Tunstall.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy Weirich, District Attorney General; and Marianne Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Factual Background*

After a three-day trial, a Shelby County jury found Defendant guilty of attempted second degree murder, employing a firearm during the commission of a dangerous felony, and aggravated assault. Before the trial began, the court held a hearing on the State's potential introduction of evidence of other acts, under Tennessee Rule of Evidence 404(b), specifically evidence regarding the previous arrest of Defendant for the murder of the victim's brother. The State argued that this evidence was relevant for identification of Defendant and for Defendant's intent. The State also argued that evidence of the victim's state of mind regarding the prosecution of Defendant for the homicide was relevant to rebut any defense suggesting that the victim fabricated the entire incident for retribution against Defendant. Defendant argued that the State should not be allowed to introduce any evidence that Defendant was previously charged with the murder of the victim's brother because this evidence was impermissible other act evidence and unfairly prejudicial. After much discussion, the court ruled that the State could introduce evidence limited to the fact that Defendant was previously arrested for the homicide of the victim's brother. The court also decided that it would require a limiting instruction, informing the jury that the charge was dismissed by the State and not presented to the grand jury for indictment. The court would not allow the State to introduce any additional details of the homicide.

The State began its case-in-chief with the testimony of the victim, Lawyer Carter. Mr. Carter was an unmarried, thirty-three year-old line operator who lived with his four minor children in Shelby County. He admitted that he was previously convicted of unlawful possession of marijuana with intent to manufacture, sell, or deliver. He was also convicted of theft of property valued over $1,000. In October 2010, during the events that follow, Mr. Carter was also living with his fiancée, who died prior to the trial.

Mr. Carter testified that on October 8, 2010, he left work and drove home before 6:00 p.m., while it was still light outside. On his way home, at the intersection of Pillow and Ethlyn streets, Mr. Carter saw Defendant and "a few more guys" standing in a group. Mr. Carter observed the group and kept driving home. He denied speaking to or making any gestures to Defendant. Mr. Carter and Defendant had grown up in the same neighborhood. Further, Mr. Carter told the jury during his direct examination that he was familiar with the Defendant because Defendant "was locked up for killing [Mr. Carter's] brother back in '07."

When Mr. Carter got home, his fiancée asked him to go to the store to buy milk and drinks for dinner. He left for the store by himself. While driving down Ethlyn Street, he stopped and spoke to a friend. At mention of Defendant during the conversation, Mr. Carter said, "F-- that n--. I ain't worried about him. He's about to get indicted." He then proceeded to the store. After completing his purchase, he drove around a few corners in the neighborhood before returning home.

-2-

According to Mr. Carter, he was driving on Silver Street between 6:30 p.m. and 7:00 p.m., while the sun was going down. During this time, he saw Defendant walking toward the driveway of the place where Defendant's cousin lived. Defendant and his cousin met briefly in the backyard, and then Defendant started walking toward the street. Mr. Carter saw Defendant carrying "a big black automatic gun" in his hand. Mr. Carter could not identify the exact model of the handgun but "it was like a .45 or something." Defendant approached Mr. Carter's vehicle, which was in the middle of the street because there were vehicles parked on both sides of the road that prevented Mr. Carter's vehicle from being completely in one lane at a time. Mr. Carter stopped his vehicle because he did not want to hit Defendant in the street. Defendant cocked the gun and began threatening the victim. Defendant said something to the effect of, "I'll shoot you in the head," to which the Mr. Carter replied, "If you're that tough, go on and shoot me then." Mr. Carter testified that he was scared. Defendant pulled the trigger, but the gun did not fire, and Mr. Carter drove off.

Expounding on the encounter, Mr. Carter said that when Defendant approached his vehicle, he came within about one and a half feet of the driver's side window. He stated that Defendant "had cocked the gun[,] talking about he ought to shoot me in the head like he did my brother and all this stuff." Shortly thereafter, Mr. Carter recalled, "He talking about, 'I ought to shoot your bitch ass in the head like I did your brother,' and he was talking a lot. So I said, 'Well, if you're that tough go on and do it.'" Mr. Carter denied threatening Defendant in any way. Defendant pointed the gun at Mr. Carter's head from approximately eight inches away. The car's window was rolled halfway down. He acknowledged that he was scared and afraid for his life. Defendant had a medium afro hairstyle, glasses, and gold teeth and was wearing a white t-shirt and black pants, the same outfit that Mr. Carter had seen Defendant wearing earlier on his way home from work. Defendant pulled the trigger three or four times before the victim drove away. As he left, Mr. Carter heard Defendant say, "Don't bring your bitch ass around here no more."

After the incident, Mr. Carter drove straight to his house. He first called to speak with the detective who investigated his brother's homicide, but the detective was no longer in that law enforcement division. He then called his aunt, who had adopted him when his mother died. After speaking for three or four minutes, he then called 911 as urged by his aunt. The police went to his house, and he described the incident and Defendant's appearance. The following Monday, Mr. Carter identified Defendant out of a six-photo lineup, which was introduced at trial.

On cross-examination, Mr. Carter admitted that he was a "small time weed seller." At the time of the incident, he was not driving straight back to his house from the store because he was "making blocks" around the neighborhood. He was not looking to sell any marijuana at that time, but he was simply looking to see who all was around the

neighborhood. He said he did not think that Defendant would be at the house when he drove by because Defendant was somewhere else when the victim saw him on the way home from work. His cruising speed was between ten and fifteen miles per hour.

When asked why he did not drive away from Defendant immediately when he saw the gun, Mr. Carter said that he did not know what Defendant was going to do with it. Once Defendant approached him on the street, Mr. Carter stopped the vehicle because he "was going to let him shoot" while Defendant's cousin, his cousin's grandmother, and his sisters were all watching. He said that he would rather have Defendant "shoot me face to face" than in the back of the head while driving away.

Mr. Carter testified that, prior to the incident, the detective investigating his brother's death told him that Defendant would be indicted for murder. He denied that he was lying about the incident as his "way of getting even" with Defendant for his brother's murder because "that come with life[.] [P]eople die." Mr. Carter said, "I was mad, but I couldn't do nothing about it because you let the Lord and the law deal with it."

After several rounds of re-direct and re-cross examinations of the victim, the State next called Joyce Flynn, who was Mr. Carter's aunt and adoptive mother. She testified that on the evening of October 8, 2010, Mr. Carter called her on the phone and said, "You remember the guy that killed [my brother][?] [H]e just put a gun to the side of my head. The gun didn't go off. He clicked it a few times and it didn't go off." Ms. Flynn told Mr. Carter, "You know, you're blessed, and you need to call the police." The trial court admitted this testimony, over the objection of defense counsel, as a prior consistent statement of the victim. The trial court gave a limiting instruction to the jury that this testimony could not be used as substantive evidence.

The State then called Officer Ryan Thompson of the Memphis Police Department, who went to Mr. Carter's home at 7:15 p.m. after the 911 call. He recalled the following information from the victim:

> He advised he was driving on Silver Street en route to his house. He made it to around the 1500 block and was approached by a male black known to him as Donnell Tunstall. And, Mr. Tunstall was wielding a black handgun and approached his driver's side and advised Mr. Carter that he was going to shoot him like he shot his brother.

Officer Thompson stated that Mr. Carter told Defendant "to go ahead and do it." Mr. Carter also reported that Defendant "attempted to cock the handgun and pulled the trigger, but the handgun didn't fire." Mr. Carter told Officer Thompson that Defendant brandished the

handgun "around a foot away . . . from his head" and that he drove away after the gun did not fire. Mr. Carter described Defendant's race, height, weight, appearance, and clothing to Officer Thompson, all of which was consistent with Mr. Carter's testimony at trial. Mr. Carter also gave a description of Defendant's vehicle to Officer Thompson. On cross-examination, Officer Thompson testified that, after interviewing Mr. Carter, he drove to Silver Street but did not find any bullets, shell casings, or a gun in the vicinity.

The State then called Marvin Pender, the 911 records custodian for Memphis Police Communications. Mr. Pender authenticated the recording of the 911 call from Mr. Carter on October 8, 2010, which was then played in its entirety for the jury. During this call, Mr. Carter identified Defendant in connection with the murder of Mr. Carter's brother.

The defense began its case-in-chief with testimony from Defendant's cousin, Gerron Dockery. At the time of trial, Mr. Dockery was serving a twelve-year sentence with the Tennessee Department of Correction for facilitation of aggravated arson. Mr. Dockery also pled guilty to a Class B felony in 2006 for unlawful possession of cocaine with intent to sell. Mr. Dockery said he was outside of his aunt's house on the evening of the incident, along with Defendant, his cousin, some other family members, and kids. He had known Mr. Carter for his entire life because they were from the same neighborhood. Mr. Dockery saw Mr. Carter on the evening of October 8th. He saw Mr. Carter drive by the house slowly without stopping. No words were exchanged. According to Mr. Dockery, Defendant did not pull a gun or get in front of Mr. Carter's vehicle. Mr. Dockery remained at the house until 7:00 or 8:00 p.m. Defendant left the house an hour or two before him. Mr. Dockery stated that he remembered that evening because Mr. Carter did not often drive by the house; the event was unusual.

Defendant did not testify. The jury found him guilty as charged of all counts. The trial court merged the aggravated assault conviction with the attempted second degree murder conviction. After a hearing, the trial court sentenced Defendant to twenty-two years as a persistent offender and sentenced him to ten years for the firearm conviction as a violent offender. The sentences were ordered to be served consecutively. Defendant's subsequent motion for a new trial was denied after a hearing on August 15, 2013. Defendant then timely appealed to this Court.

*Analysis*

On appeal, Defendant contends that there is insufficient evidence to support the jury's verdicts and that the trial court erred by admitting evidence of Defendant's prior arrest for the murder of the victim's brother.

*A. Sufficiency of the Evidence*

Defendant argues that the evidence presented at trial is legally insufficient to support

any of his convictions. Specifically, Defendant asserts, without citing any supporting authority, that there was not enough evidence for a rational jury to find that the object pointed at the victim was actually a functional handgun—and not merely a toy gun or an unloaded handgun—beyond a reasonable doubt. The State argues that the evidence, when viewed in the light most favorable to the State, is sufficient to support a finding that the object was in fact a real gun.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The jury convicted Defendant of attempted second degree murder. "A knowing killing of another" is second degree murder. T.C.A. § 39-13-210(a)(1). Criminal attempt of an offense may be proven in one of three ways, where an individual:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a). "Whether the appellant 'knowingly' attempted to kill his victim is a question of fact for the jury." *State v. Inlow*, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000).

Defendant was also convicted of aggravated assault and employing a firearm during the commission of a dangerous felony. Although the trial court merged Defendant's attempted second degree murder and aggravated assault, we will consider the sufficiency of the evidence as to all convictions in order to facilitate potential further appellate review. *See State v. Devin Torquin Watkins*, No. E2013-00420-CCA-R3-CD, 2014 WL 1329278, at *5 (Tenn. Crim. App. Apr. 3, 2014), *perm. app. denied* (Tenn. July 15, 2014). Intentionally or knowingly causing another to reasonably fear imminent bodily injury is an assault. T.C.A. § 39-13-101(a)(2). An assault is aggravated if it "involved the use or display of a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(iii). A "deadly weapon" is defined as: "(A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(a)(5). "It is an offense to employ a firearm during the . . . [a]ttempt to commit a dangerous felony." T.C.A. § 39-17-1324(b)(2). Attempted second degree murder is a "dangerous felony." T.C.A. § 39-17-1324(i)(1)(B). A "firearm" is "any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." T.C.A. § 39-11-106(a)(11).

The jury was presented with the following evidence at trial. Mr. Carter testified that Defendant displayed and cocked a "a big black automatic gun" before stepping into the street in front of Mr. Carter's vehicle. Defendant then moved to the driver's side window of the vehicle and pointed the handgun at Mr. Carter's head from less than a foot away. Mr. Carter testified that the object with which Defendant threatened his life was an actual pistol. Defendant threatened to shoot the victim in the head and pulled the trigger multiple times. Defense counsel thoroughly cross-examined Mr. Carter about the entire incident. Defendant's cousin, currently in the custody of the Tennessee Department of Corrections, testified that he was present at the time of the alleged incident and represented that the encounter never occurred.

In spite of the testimony of Defendant's cousin, the jury found Mr. Carter credible and

accredited his testimony over that of Defendant's cousin. As the trier of fact, this determination is within the province of the jury. We find that a rational jury could find that the victim's testimony established Defendant's guilt of all three crimes beyond a reasonable doubt. "It is well-settled law in Tennessee that 'the testimony of a victim, by itself, is sufficient to support a conviction.'" *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) (quoting *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)); *see also United States v. Beverly*, 99 F.3d 570, 573 (3d. Cir. 1996) (analyzing cases accepting only eye witness testimony to establish use of a real firearm). While reviewing a challenge to the sufficiency of the evidence for attempted second degree murder in *Inlow*, this Court noted that "[i]ntent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." 52 S.W.3d at 104-05 (quoting *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

However, Defendant contends that the evidence was insufficient, as a matter of law, to prove that Defendant used a real handgun that was loaded and operational. The State argues that the victim's testimony was sufficient and that the functionality of the gun is immaterial. We agree with the State. The circumstantial evidence presented in this case was enough to allow the jury to make a reasonable inference that Defendant employed what he believed to be an actual, loaded handgun. *See* T.C.A. § 39-12-101(a)(1). Although there was no direct evidence of a bullet in the chamber, there was testimony from Mr. Carter that Defendant wielded a real gun and evidence from Defendant's own affirmative conduct suggesting that the handgun was in fact real and that Defendant intended to use it to kill Mr. Carter. Defendant handled the gun, made verbal threats about using the gun to shoot Mr. Carter's head from close range, and repeatedly pulled the trigger. This is sufficient circumstantial evidence from which a rational jury could infer beyond a reasonable doubt that Defendant employed what he believed was an actual loaded handgun, while attempting and intending to take the victim's life. *See State v. Christopher Osborne*, No. M2000-00802-CCA-R8-CD, 2001 WL 252083, at *4 (Tenn. Crim. App. Mar. 14, 2001) (finding sufficient evidence of attempted first degree murder where the defendant threatened the victim within thirty minutes of the attack, attempted to gain entry into the victim's residence while the victim was inside, and thrust the barrel of a shotgun inside victim's home but where the defendant never fired the weapon and the weapon was never recovered). While it is possible that Defendant could have knowingly used a gun that was unloaded and only intended to frighten the victim, proof beyond a reasonable doubt does not require that there be no other conceivable explanation for a defendant's conduct. *See State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) ("Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt."); *see also State v. Hester*, 324 S.W.3d 1, 57-58 (Tenn. 2010) (reviewing jury instructions on reasonable doubt).

After careful review of the record, we conclude that the evidence was sufficient to support Defendant's convictions.

### B. Evidence of Previous Arrest for Murder

Defendant also argues that the trial court abused its discretion by admitting testimony about Defendant's previous arrest for the alleged murder of Mr. Carter's brother. Specifically, Defendant asserts that the testimony was impermissible propensity evidence. Alternatively, Defendant contends that, under Rule 404(b) of the Tennessee Rules of Evidence, the State should have had to prove that Defendant committed the murder by clear and convincing evidence and that the danger of unfair prejudice outweighed the evidence's probative value. The State argues that the evidence was relevant, not offered for propensity purposes, and not unfairly prejudicial; otherwise, any error was harmless. We conclude that most of this evidence was improperly admitted.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Where the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, it may be inadmissible. Tenn. R. Evid. 403. However, "[e]vidence of other crimes, wrongs, or acts" is inadmissible character evidence if offered to show a defendant's "action in conformity with [a] character trait." Tenn. R. Evid. 404(b); *State v. Parton*, 694 S.W.2d 299, 654 (Tenn. 1997). "The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994)). Yet, such evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme" or "contextual background." *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013). Other act evidence may be admitted for these purposes only after the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed

by the danger of unfair prejudice.

Tenn. R. Evid. 404(b) (2013).

Tennessee's Rule 404(b) establishes more stringent safeguards for ensuring proper introduction of this kind of evidence than its federal counterpart. *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002) (citing *State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996)). *Compare* Tenn. R. Evid. 404(b) *with* Fed. R. Evid. 404(b). Our rule has been aptly described as one of "exclusion" rather than inclusion. *State v. Henry Lee Jones*, No. W2009-01655-SC-DDT-DD, ___ S.W.3d ___, 2014 WL 4748118, at *21 (Tenn. Sept. 25, 2014) (citing *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)). Consequently, "[t]rial courts have been encouraged to take a restrictive approach of Rule 404(b) because 'other act' evidence carries a significant potential for unfairly influencing a jury." *Id.* (internal quotation and citation omitted). This is particularly true where the other act sought to be introduced is substantially similar to the crime for which a defendant is being tried. *McCary*, 119 S.W.3d at 243.

A trial court's decision to admit or exclude evidence under Rule 404(b) is reviewed by an abuse of discretion standard, if the trial court has substantially complied with the procedure mandated by the Rule. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Where the trial court has failed to substantially comply with the procedural dictates of Rule 404(b), the standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-653)); "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party." *Henry Lee Jones*, 2014 WL 4748118, at *22 (internal quotation and citation omitted). Appellate court review of the issue of admissibility is confined to the evidence presented to the trial court during the jury-out hearing. *DuBose*, 953 S.W.2d at 653.

Before the trial began, the trial court held a hearing on the admissibility of certain other act evidence that the State gave advance notice of its intent to introduce during its case-in-chief. From the transcript of the hearing, it appears that the following different pieces of evidence were considered by the court and the parties to be potential Rule 404(b) evidence relating to Defendant's previous arrest: (1) previous statements of identification made by Mr. Carter to his aunt, to Officer Thompson, and to the 911 dispatcher in which Mr. Carter referred to Defendant as his brother's killer; (2) expected testimony from Mr. Carter that he knew Defendant because he was previously arrested for murdering Mr. Carter's brother; (3) expected testimony from Mr. Carter that Defendant made a threat to Mr. Carter, which referenced the killing of Mr. Carter's brother; and (4) Mr. Carter's subjective belief that, at the time of the incident, Defendant was going to be indicted and prosecuted for the alleged murder of his brother. The State argued that these pieces of evidence, collectively, were

admissible to establish intent, identification of the defendant, and the victim's state of mind. To supplement these pieces of evidence, the State also sought to introduce "simply the fact that the defendant was . . . arrested and charged with first degree murder, that he was, in fact arrested, [and] that there was a preliminary hearing scheduled in the matter."

After hearing extensive argument from the parties, the trial court issued its evidentiary ruling. In doing so, the trial court made inconsistent statements about whether it was proceeding under Rule 403 or Rule 404(b). At one point, the court said:

> The State's really not putting on proof of a crime. They're putting on proof that at one time [Defendant] was charged and those charges were dismissed at a preliminary hearing. So, really this is a 403 test, but even using the stricter approach of 404(b), the Rule of Exclusion, I think the State would have a right to put on the victim's statement.

At another point, the court said, "I think the fact that he was charged is not a bad act, so it's not strictly a 404(b) issue . . . [I]t is not the letter of the law but in the meaning of the law." Ultimately, however, the trial court ruled under Rule 404(b):

> On 404(b)(3), . . . [the rule says that] "the Court must find proof of the other crime, wrong, or act to be clear and convincing." I find that the act in this case is not of the [D]efendant; [it is] the act of the State in charging the [D]efendant with a homicide. The proof of that is clear and convincing and [the parties] agree that it happened. . . . I'm going to allow the State to put on the fact that at one point the [D]efendant was charged with the homicide of [Mr. Carter]'s brother to show the relationship between the parties, their identification, and also . . . to show the rationale behind the [D]efendant's statement. And, I find that, if we give the proper curative instructions that he was not charged with [the murder], that probative value is not outweighed by the danger of unfair prejudice because [Defendant] was not prosecuted for [the murder]. And, I also find that it is somewhat probative that . . . the alleged victim then called the homicide investigator and that's how he called him and everything. Because the 911 tape, which I think the State has a right to put on[1] because of the defense of this [D]efendant [which will be that] this victim is making it up.

(Footnote added).

---

[1] The court decided to reserve ruling on the admissibility of the 911 recording until the prosecutor sought to introduce it and instructed the attorneys not to mention the recording in opening arguments.

As an initial matter, we feel compelled to point out that the trial court should have conducted a separate analysis for each specific piece of evidence, rather than issue a blanket ruling covering all evidence related to Defendant's arrest for the murder of Mr. Carter's brother.[2] Such treatment was necessary for proper individualized consideration of the admissibility of each specific piece of evidence because the nature, purpose, probative value, and prejudicial effect differed among each. *See, e.g.*, *DuBose*, 953 S.W.2d at 653 (stating that "[t]he admissibility of the evidence of prior injuries to the victim's abdominal area, and the evidence of prior injuries to the victim's hand and head, must be considered separately" and proceeding to analyze both sets of injuries separately). We will proceed in such a manner.

### 1. Victim's Statements of Identification

We first note that, on the ground of relevance alone, identity was an inadequate basis for the admission of any of the evidence relating to Defendant's prior arrest. While the State bears the burden of proving a defendant's identity as the perpetrator of the crimes for which he or she is charged, identity was never at issue in this case and therefore was not a "fact . . . of consequence to the determination of the action." Tenn. R. Evid. 401; *see DuBose*, 953 S.W.2d at 653 ("The relevance of proffered evidence is determined by the issues presented for resolution in the trial, which, in turn, are determined by the elements of the offense charged and the defense asserted by the accused."); *see also Parton*, 694 S.W.2d at 302 ("[E]vidence that the defendant committed another crime is admissible only if the ground for relevance is actually being contested in the case on trial.") (quoting *Bunch v. State*, 605 S.W.2d 227, 230 (Tenn. 1980))). Defendant did not dispute his identity as Mr. Carter's alleged attacker, and Mr. Carter would testify that he had known Defendant for a long time from having grown up in the same neighborhood. This much was made aware to the trial court by the parties during the hearing. Consequently, all of Mr. Carter's statements that identified Defendant merely on the basis of his association or involvement with the death of Mr. Carter's brother were superfluous and should have been redacted to exclude any reference to this subject. Similarly, Mr. Carter should not have been allowed to testify that Defendant "was locked up for killing [Mr. Carter's] brother back in '07" as a means of explaining how Mr. Carter knew Defendant. All of this evidence was irrelevant to the issue of identity because the identity of Mr. Carter's attacker was not at issue.

### 2. Defendant's Threatening Statement

Mr. Carter testified that Defendant threatened him with two different versions of a

---

[2]However, the State's argument was presented in such an all-encompassing fashion, without distinguishing between all of the evidence, that it may have caused the trial court's blanket ruling. If each separate piece of evidence relating to the previous arrest had been presented individually, it would have significantly clarified the evidentiary issues and ensuing arguments that materialized during the hearing.

particular statement that referred to Mr. Carter's deceased brother. During the hearing, the prosecutor repeatedly represented to the trial court that Mr. Carter would testify that, during the encounter, Defendant threatened, "I ought to shoot you in the head like your brother." On the stand, however, Mr. Carter also testified to a second version of the threat, which included an admission to the killing of Mr. Carter's brother: "I ought to shoot you in the head like *I did* your brother."

Although we did not find any analogous Tennessee cases, other jurisdictions have found similar threats by a defendant to be admissible, despite including an admission or reference to separate other acts of the defendant. Some courts hold that Rule 404(b) controls the admissibility of such statements. For example, in *Commonwealth v. Claypool*, 495 A.2d 176, 177-78 (Pa. 1985), the court held as admissible a rape victim's testimony that she had been frightened into having sex with the defendant because he described to her a prior instance of rape for which he had gone to jail.[3] Considering the evidence to fall under the scope of Rule 404(b), the court explained:

> In a case such as this, in which the defendant himself has made his prior criminal activity or conviction—whether or not the defendant actually did engage in such criminal activity or actually did have such a conviction—an element of the crime with which he is now charged, our failure to allow this evidence to be admitted would grant to a whole class of criminals immunity from their crimes. If such evidence were not admissible, a criminal would only need to make sure that the fear needed for the commission of his crime emanated from a threat which only embodied a claim of prior criminal activity in order to be "excused" for his activity. If there were other threats of fear accompanying a defendant's claim that he had engaged in prior criminal activity, the exclusion of evidence of the defendant's statement would present a much weaker case. We hold, therefore, that when there is evidence that a statement about prior criminal activity was made by the defendant in order to threaten and intimidate his victim, and when force or threat of harm is an element of the crime for which the defendant is being tried, such evidence is admissible.

*Id.* at 179 (footnote omitted); *cf. Couch v. State*, 566 S.W.2d 288, 290 (Tenn. Crim. App.

---

[3]The victim testified, "[The defendant] told me that him and another fellow were at his cousin's house and they had been drinking and they tied up his cousin and then they took the cousin's wife upstairs and that he was in jail for that." *Claypool*, 495 A.2d at 177. The victim "was scared to death because then I know that that's what he was going to do to me." *Id.* at 178. Additionally, the victim testified, "[The defendant] told me that I better do it and he said I better not scream and holler because ever since he's been in jail any loud noises like that, if I screamed would make him go crazy." *Id.*

1978) (concluding that rape victim's testimony that the defendant referenced the rape of another girl during the charged incident, without admitting to the other crime, was relevant and properly admitted).

Adopting the rule set forth in *Claypool*, the court in *Weber v. State*, 547 A.2d 948, 956 (Del. 1988), reasoned:

> [W]e find that [the defendant]'s statements to [the victim and the witness] were properly admissible into evidence under Rule 404(b). To obtain a conviction for intimidation and aggravated intimidation, the State had to show that [the defendant] acted knowingly and with malice. Malice is defined as "an intent to vex, annoy, harm or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." In addition, [the defendant] was charged, in the context of the aggravated intimidation count, with making an express threat of force or violence against [the victim]. [The defendant]'s statements to [the victim and the witness] that he had killed before and that he had bribed a judge were not being admitted to show a criminal disposition on his part or even that he had, in fact, committed a prior criminal act. Indeed, [the defendant]'s allegation of bribery was completely untrue. However, these statements were admissible because they were made as a part of the threats communicated by [the defendant] to [the victim]. These statements constituted the act of intimidation that was an element of the offenses with which [the defendant] was charged.

(Internal citations omitted).

In *Reay v. State*, 176 P.3d 647, 651 (Wyo. 2008), the court held that the victim's testimony as to a statement made by the defendant—"if I thought that [the defendant] abused me before, he didn't abuse me before; this was abuse"—as he assaulted her was admissible. The court held that, under the circumstances, the victim's testimony was not Rule 404(b) evidence:

> The phrase "if I thought that [the defendant] abused me before, he didn't abuse me before" was conditional, not a positive assertion that [the defendant] had abused [the victim] before. To the extent it implied past abuse, it gave no details about any particular instance of abuse, and no mention of when, where, or how it may have occurred. [The victim]'s testimony was simply too ambiguous to constitute evidence of uncharged misconduct . . . .

*Id.* However, the court also noted that, had the statement been more definite, "the fact that

this evidence involved [the defendant]'s own statement, made to the victim while committing the actions for which he was charged, does not exempt it from [Rule] 404(b)." *Id.*

Other courts have held that such statements are not governed by Rule 404(b). In *State v. Martin*, 643 A.2d 946, 951 (N.H. 1994), the court held that the testimony of a child rape victim about the defendant's threat to kill her like her dead pets if she refused him or told anyone about his actions was not other act evidence under Rule 404(b).[4]

> The defendant first contends that the trial court should have required the State to establish these threats without referring to the victim's pets at all. We disagree. It would have been impossible as a practical matter for the State to introduce evidence of the victim's fear without also introducing some evidence of the basis for that fear. The defendant's threats were a material part of the entire course of conduct surrounding the commission of the alleged crimes. By incorporating statements about his past misdeeds into a criminal threat, the defendant is not shielded from the use of the substance of that threat in a subsequent prosecution. As the references in these threats to the death of the victim's pets were not offered for their truth, but rather for the limited purpose of substantiating the victim's fear and explaining her delay in reporting the abuse, the trial court was well within its discretion to allow their introduction.

> . . . .

> Rule of Evidence 404(b) and its requisite test are not applicable here because evidence establishing the very threat that coerced the victim to comply with the defendant's demands is not evidence of other crimes, wrongs, or acts. The appropriate test for admissibility in this instance, therefore, is contained in Rule of Evidence 403, which permits the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.

*Id.* at 951-52 (citations omitted).

---

[4] At the jury-out hearing, the trial court ruled that the State would only be permitted "to elicit testimony that the animals had died and that the defendant had seized upon the occasion of those deaths to threaten the victim, but . . . the State [would not be allowed] to show that the defendant had taken credit for killing the animals." *Martin*, 643 A.2d at 951. The victim violated this ruling during the trial, but the reviewing court declined to "comment on the admissibility of the victim's statement that the defendant told her that he had killed her dog." *Id.* at 952.

In *United States v. Mare*, 668 F.3d 35 (1st Cir. 2012), where the defendant was convicted of arson for the burning of the beauty salon that he owned for insurance benefits, the court held that the testimony of a former stylist at the salon about a conversation with the defendant prior to the fire was not controlled by Rule 404(b). At trial, the stylist testified that, prior to the incident at issue, the defendant told the stylist that he was going to burn the salon to receive insurance money that would finance a move to a new city. *Id.* at 37. To dispel the stylist's apparent skepticism, the defendant "retorted that arson was in fact nothing new to him . . . . [because,] in May of 2000, [the defendant] was responsible for another fire at the salon that had led to an insurance payout large enough to cover not only the cost of repairs, but also several other outstanding debts." *Id.* Thus, the defendant boasted to the effect that "he was not only capable of, but successful at, using arson to his financial benefit." *Id.*

The court provided the following explanation:

The district court initially suggested that [the witness's] testimony was admissible for several of Rule 404(b)'s permissible purposes, but ultimately admitted the testimony for a different reason. The court held that the testimony concerned matters intrinsic to the crime charged and therefore did not trigger Rule 404(b)'s limitation on the use of evidence of other crimes, wrongs or acts. The court's theory was that relevant inferences could be drawn from [the defendant]'s account of his own state of mind, rather than from the fact of a prior bad act. In its written order, the court singled out [the defendant]'s fraudulent intent as one such inference. It relied on our decision in *United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 50 (1st Cir. 2004), where we held that intrinsic evidence that would satisfy the charged crime's specific intent element is not governed by Rule 404(b).

This was not an abuse of discretion. In the typical 404(b) scenario, the evidentiary focal point is the existence of some bad conduct other than the charged offense. The concern is that, upon learning of that prior conduct, the jury might think worse of the defendant's character out of some "rel[iance] on the aphorism 'once a criminal, always a criminal.'" Here, by contrast, the focal point was the defendant's own statement concerning the charged offense itself—"I am going to do it the way I did it the last time." The fact that [the defendant] identified his plot with the uncharged offense sheds relevant light on his mindset in committing the charged offense. For example, as the district court suggested, it supported the government's case that he specifically intended to commit the charged arson in order to defraud, an element of the mail fraud statute under which he was charged. That reasoning does not

depend on an inference regarding [the defendant]'s character for acting in conformity with a prior bad act. Indeed, it does not even depend on [the defendant]'s having actually committed the prior bad act at all. It depends only on [the defendant]'s having made the statement. Reasonable jurors could have made pertinent inferences based solely on [the defendant]'s bark, regardless of whether they believed that he had ever previously backed it up with his bite. [The defendant]'s words were therefore relevant for a reason other than, to borrow a familiar phrase from another evidentiary canon, the truth of the matter asserted.

*Id.* at 38-39 (citations and footnote omitted).

In light of these cases, we believe that both versions of the threat were admissible. The threat itself was part of Defendant's underlying conduct in perpetrating the charged offense of aggravated assault. A conviction for assault in this case required proof "that the defendant intentionally or knowingly caused Lawyer Carter to reasonably fear imminent bodily injury," as stated in the trial court's jury charge. Defendant's threat, in either form, constituted part of the act that caused the victim to reasonably fear imminent bodily injury. *See also* Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence § 4.04[12][a], at 4-115 (6th ed. 2013) (explaining that conduct that is part of the basis for the crime of conspiracy is not governed by Rule 404(b) because "evidence covered by Rule 404(b) . . . is used to *infer* that someone did an act rather than to prove the act itself"). Additionally, Defendant's threat was independent, direct proof of his *mens rea* for both the attempted murder and the aggravated assault regardless of whether he was actually involved in the murder of Mr. Carter's brother. The victim's testimony was not being offered to prove that Defendant actually committed that uncharged crime but to prove that he made the statement as part of the assault and attempt to kill the victim. *Cf. State v. Terry Stewart Moore*, No. E2001-00153-CCA-R3-CD, 2002 WL 1787947, at *9 (Tenn. Crim. App. Aug. 2, 2002), *perm. app. denied* (Tenn. Dec. 9, 2002) (stating that the defendant's acts of abuse and mistreatment to the victim's body while she was unconscious "were part and parcel of the crime of voluntary manslaughter" and "part of the same criminal transaction" such that the conduct was "not a prior bad act but a concurrent bad act inseparable from the commission of the crime").

Previous cases from our supreme court suggest that such evidence should be properly considered evidence of other acts subject to Rule 404(b) under a broad view of the rule, as in the former cases identified above. In *DuBose*, our supreme court gave the following direction for potential Rule 404(b) evidence:

Where the evidence of other crimes, wrongs, and acts may reflect upon the

-17-

character of the accused, the procedure set forth in Rule 404(b) should be followed, even though the evidence is offered to prove a material fact not necessarily related directly to the accused. If, after hearing the evidence, the trial court finds that the evidence does not implicate the accused, the weighing of probative value against unfair prejudice will be made pursuant to Rule 403. If the court finds that the evidence reflects upon the character of the accused, the weighing will be made pursuant to Rule 404(b).

953 S.W.2d at 655; *accord State v. Mallard*, 40 S.W.3d 473, 486 (Tenn. 2001). Assuming that the vague reference to Mr. Carter's brother in the former version of the threat (without the admission "I did") could be understood by a jury that Mr. Carter's brother was shot in the head or otherwise murdered on a previous occasion, the reference alone, without more, does not imply that Defendant was the one who committed that crime. *Cf. DuBose*, 953 S.W.2d at 653-54 (determining that evidence of prior injury to infant's stomach was not subject to Rule 404(b) because the evidence did not suggest that the defendant caused the prior injury). Accordingly, that version of the threat does not seem to constitute other act evidence that is subject to Rule 404(b). But the latter version of the threat seems plainly to implicate Defendant in the murder of Mr. Carter's brother, and therefore, under the rule of *DuBose*, would constitute other act evidence that must be assessed under Rule 404(b), notwithstanding that the evidence was not offered to establish that Defendant did in fact commit the murder. However, we need not determine whether this evidence constitutes other act evidence within the meaning of Rule 404(b) because we believe that its probative value outweighs its prejudicial effect nonetheless.

Defendant's reference to the death or murder of Mr. Carter's brother in the same breath that he used to threaten Mr. Carter's life with a handgun was highly probative evidence as to the *mens rea* element for both attempted murder and aggravated assault, and this element, unlike identity, was at issue in this case. The *Mare* court reasoned:

> [The defendant's] invocation of a prior [uncharged crime] makes his threat more credible. One who expresses a desire to commit a crime may merit some suspicion, but one who expresses that desire while recounting in some detail a prior commission of the same crime merits a full-scale intervention. The second of these individuals, far less ambiguously than the first, sounds like someone who says what he means and means what he says. Thus, whatever doubt might have existed about the sincerity of [the defendant's] intention to strike in the future was minimized by the specificity with which he described how he had struck in the past.

668 F.3d at 40. We agree. Defendant's threat was an articulation of his internalized

-18-

intention to kill Mr. Carter in the same manner in which Mr. Carter's brother had been killed. Although not described in great detail, a threat of this nature—one alluding to a specific crime committed in a similar fashion—gives more credence to the conclusion that Defendant was acting with deliberate intention, rather than simply in jest, as may more readily be suggested by a vaguer, less-detailed threat.

While it is true that the State could have proven Defendant's intent to kill simply with a redacted version of Defendant's threat—"I ought to shoot you in the head"—this sanitized version of the threat does not carry the same weight as it does in its unedited form with its menacing, personal reference to the previous murder of Mr. Carter's brother. This is especially true in the context of the aggravated assault charge, which requires intent to cause fear. Defendant's calculated reference to killing Mr. Carter's brother was obviously intended to sound a unique chord of personal fear within Mr. Carter beyond empty threats. Given the lack of other evidence, in this instance, the State should be forced to rely on anything but Defendant's entire threat. *See Claypool*, 495 A.2d at 180.[5]

On the other side of the evidentiary balance, Defendant's purported admission to killing Mr. Carter's brother, whether true or not, undoubtedly carried a risk of unfair prejudice. *See State v. Sexton*, 368 S.W.3d 371, 405 (Tenn. 2012) ("The term 'unfair prejudice' has been defined as 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" (quoting *DuBose*, 953 S.W.2d at 654)). Any suggestion that he may have actually committed the similar, uncharged crime risked the jury's misusing that evidence for an improper purpose. However, the risk that the jury might draw an improper inference from Defendant's character was reduced because the State was not putting on detailed evidence in an attempt to establish that Defendant actually did murder Mr. Carter's brother, unlike typical evidence of other uncharged crimes. *See Mare*, 668 F.3d at 41 (reasoning that "the [trial] court minimized the chances that the jury would convict for an uncharged offense rather than the charged one" by "keeping the focus away from the prior bad act" through its exclusion of proof of the occurrence of the other fire

---

[5]The *Claypool* court explained:

> Our conclusion is not altered by the fact that there was other evidence of force against the victim. The Commonwealth was not required to omit portions of its case to accommodate appellee. A jury is free to believe all, part or none of the evidence presented. For this reason, the Commonwealth can never be certain which, if any, of its evidence will be believed by the jury and regarded as proving a particular fact beyond a reasonable doubt. We will not hamper the Commonwealth's ability to present all of its relevant evidence to the jury to prove each and every element of the crimes charged.

495 A.2d at 180 (internal citation omitted).

in the salon). Additionally, the prejudice can be minimized by a proper limiting instruction from the judge, which the jury is presumed to follow.[6] *State v. Brewer*, 932 S.W.2d 1, 27 (Tenn. 1996) (citing *State v. Johnson*, 762 S.W.2d 110, 116 (Tenn. 1988)).

Moreover, we cannot help but take notice of the following view endorsed by several of the *Claypool* court's members:

> [A] threat, fortified with an example from the actor's criminal past, as proof of a present intention to gain a criminal purpose, is as admissible as a gun, knife, bomb or any other threat. If he chooses to use his criminal past as a token of his sincerity, he is no more prejudiced than was his victim.
>
> A "threat" can be as palpable as a steel blade, the muzzle of a gun, or a ticking bomb. If the tool one uses to accomplish a criminal purpose prejudices him, so much the worse for him.

*Id.* at 180 (concurring opinion). Consequently, under the circumstances of this case, we do not believe that the risk of unfair prejudice outweighed the threat's high probative value. *See* Tennessee Law of Evidence § 4.04[8][e], at 4-105 ("If the [other act and charged act] are quite similar, the prejudicial effect may be great[;] [o]n the other hand, similarity may make the probative value quite high as well.").

Lastly, we note that, even if Mr. Carter's testimony as to Defendant's threat was properly considered to be other act evidence, the State is not required to prove by clear and convincing evidence that Defendant did in fact kill Mr. Carter's brother. Where evidence of another act of a defendant is not being offered to prove that the other act actually occurred as the basis for an inference as to a defendant's guilt of the charged offense, the other act is not subject to the proof requirement of Rule 404(b)(3). In *State v. Smith*, 868 S.W.2d 561, 578 (Tenn. 1993), our supreme court upheld the trial court's admission of "evidence that the Defendant had been charged with the aggravated assaults of two of the victims" under Rule 404(b). However, the court rejected the defendant's claim that the State should have been required to prove the charged aggravated assaults by clear and convincing evidence. *Id.* The court reasoned:

---

[6]Defendant was entitled to a limiting instruction upon request, but use of this remedy may be a double-edged sword. *See Mare*, 668 F.3d at 40-41 (observing that the defendant "could reasonably have gambled that a limiting instruction geared toward an extrinsic-evidence purpose would have done more harm than good" by drawing the jury's attention to the referenced uncharged crime). We also note the importance of the trial court including within the instruction the proper purpose(s) for which the jury may use the evidence. In this case, the trial court identified several purposes for which the evidence was being offered but only instructed the jury as to one of them.

> Strictly speaking, the evidence of which Defendant complains is not "other crimes evidence." . . . The relevant fact was that the charges were pending, and exposed the Defendant, who knew of them, to possible prosecution and punishment regardless of their validity. Proof establishing the charges' truthfulness might have been relevant to increase the strength of the State's theory that avoiding prosecution and conviction was the Defendant's motive but was unnecessary to establish the admissibility of the outstanding warrants.

*Id.* In this case, the relevant fact is the content of Defendant's threat to Mr. Carter and not the truthfulness of his admission to killing Mr. Carter's brother; therefore the State was not required to prove that Defendant did in fact murder Mr. Carter's brother by clear and convincing evidence in order for evidence of the threat to be admissible.

### 3. Fact of Defendant's Previous Arrest

If Defendant's threat was properly admitted, a closely-related question remains as to whether the fact of Defendant's arrest was also properly admitted. The most convincing reason for its admission would be for background or context to explain the reference to Mr. Carter's brother in Defendant's threat. This was one of the purposes for which it was admitted by the trial court at the pre-trial hearing, although the trial court ultimately instructed the jury to consider it only for purposes of identification. As previously discussed, identification was not a proper purpose for the admission of this evidence.

"The rules [of evidence] generally disallow reference to other 'charges,' whether credible or not," and evidence of "mere charges or prior arrests should be avoided," unless "particularly probative." *State v. Bordis*, 905 S.W.2d 214, 228 (Tenn. Crim. App. 1995). We recognize that the vague reference to Mr. Carter's brother in Defendant's statement likely would have confused or distracted the jury without context or explanation. Our supreme court has held that providing such context or background can be a proper purpose for admitting other act evidence. *Little*, 402 S.W.3d at 210 (citing *State v. Gilliland*, 22 S.W.3d 266, 271 & n.6 (Tenn. 2000)). However, in this case, the need for this evidence simply did not outweigh the potential for unfair prejudice that resulted from its admission. After Defendant's threat had been introduced, the State could have elicited testimony from Mr. Carter explaining that it was well-known in Mr. Carter's neighborhood, where Defendant lived nearby, that his brother had been shot and murdered. Such an explanation would have adequately filled the gap in the jury's understanding and enabled the jury to appreciate the significance of the reference in Defendant's threat to another violent murder, while also threatening the victim with a gun. Such an explanation also would have obviated any reference to Defendant's arrest for that crime, thereby avoiding any need for testimony or jury instructions about the arrest and investigation, which unfortunately became ubiquitous during the trial. Introducing the fact of the arrest, under the circumstances of this case,

created too much risk that the jury might have drawn the forbidden character inference or might have decided to convict Defendant of the charged crime in order to do justice for the unpunished previous crime.

### 4. Victim's State of Mind

The trial court also permitted the State to elicit testimony from Mr. Carter that, at the time of the incident, he believed that Defendant was still going to be indicted and prosecuted for the alleged murder of Mr. Carter's brother. The State argued that this evidence of Mr. Carter's subjective state of mind was admissible to rebut Defendant's theory that Mr. Carter was fabricating the entire encounter as a means of revenge against Defendant for murdering Mr. Carter's brother without being fully prosecuted. Had the fact of Defendant's previous arrest been properly excluded in the first place, Mr. Carter's state of mind regarding the status of that prosecution would have been irrelevant unless Defendant first opened the door. Had Defendant opened the door to this evidence during cross-examination, the evidence could have been properly admitted during the redirect of Mr. Carter or by other proof. As it happened, it was error.

### C. Harmless Error

Having determined that the evidence relating to Defendant's previous arrest for the murder of Mr. Carter's brother should not have been admitted, except for the substance of Defendant's threat, we now consider whether the admission of that evidence was harmless. "[T]he issue of whether an error is harmless does not turn upon the existence of properly admitted evidence that is sufficient to affirm a conviction." *State v. Dotson*, 254 S.W.3d 378, 389 (Tenn. 2008). Rather, "the question . . . is whether, applying Tenn. R. App. P. 36(b), the admission of this evidence more probably than not affected the verdict or resulted in prejudice to the judicial process." *State v. Rodriguez*, 254 S.W.3d 361, 375 (Tenn. 2008).[7] A defendant seeking to invalidate a conviction on appeal bears the burden of demonstrating that an error was not harmless. *Id.* at 372.

After careful review of the entire transcript of the trial, we conclude that admission of the evidence of Defendant's previous arrest for the murder of Mr. Carter's brother was not harmless. After the court's ruling at the pre-trial hearing, this evidence played a prominent

---

[7]Rule 36(b) of the Tennessee Rules of Appellate Procedure states in pertinent part:

A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

role in the State's case-in-chief and Defendant's cross-examination strategy.[8]  The trial was so replete with references to the investigation, the arrest, Defendant's jail time, and the victim's identification of Defendant as his brother's killer that we cannot conclude that Defendant received a fair trial, despite the trial court's frequent and extensive limiting instructions, which unfortunately did not adequately inform the jury of the proper purposes for which they could consider this evidence.

*Conclusion*

After a thorough review of the parties briefs, the record, and the applicable law, we conclude: (1) there was sufficient evidence to support Defendant's convictions, but (2) the trial court abused its discretion by admitting various pieces of evidence regarding Defendant's previous arrest for the murder of the victim's brother.  Accordingly, the judgments of the criminal court are reversed, and this case is remanded for a new trial on all three counts.

To be clear, we have determined that, at the retrial of this matter, either version of the threatening statements allegedly made by Defendant to Mr. Carter during the alleged incident is admissible during the State's case-in-chief.  The testimony discussed in section four of part B above (the victim's state of mind) shall only be admitted if Defendant opens the door to such.  The statements discussed in sections one and three of part B above (the victim's statements of identification and the fact of Defendant's previous arrest) shall not be admitted for any purpose.

_____
TIMOTHY L. EASTER, JUDGE

---

[8]Transcripts of the opening and closing argument of the parties were not included in the record on appeal; therefore, we cannot know the extent that this evidence affected those phases of the trial.